UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>  )<br>   Plaintiff,  )<br>  )<br> v. )<br>  )<br>  )<br>JOHN L. STANTON, )<br>  )<br>  )<br>   Defendant. ) | No. 6:21-cr-00019-REW-HAI-4<br><br>OPINION & ORDER |

\*\*\* \*\*\* \*\*\* \*\*\*

In April 2023, the Court sentenced Defendant John Stanton to a 120-month sentence for his role in writing illicit opioid prescriptions at a pill mill in Tennessee. Now, two years later, and after serving just over a quarter of his sentence, Stanton moves for compassionate release pursuant to 18 U.S.C. § 3582(c), citing his wife's recent Stage IV lung cancer diagnosis. The Court does not diminish that diagnosis; the difficulties Mrs. Stanton will face in fighting the disease are and will continue to be serious. However, Mrs. Stanton, given the current medical evidence, is not incapacitated, and Stanton has not shown that he is the only possible caregiver. This misses the high bar established by U.S.S.G. § 1B1.13(b)(3)(B). Further, the other values necessarily at play foreclose relief, in the Court's view and discretion. The Court **DENIES** Stanton's motion. The health development for Mrs. Stanton is highly concerning and regrettable. However, the separation of John Stanton from his wife and family results from and is the fruit of serious crime. The Court is not convinced that release or a reduction in sentence would be appropriate.

I. **Background**

In April 2023, the Court sentenced Stanton to a 120-month term of imprisonment for conspiracy to distribute controlled substances, including Schedule II opiates, in violation of 21 U.S.C. § 846. *See* DE 338 (Judgment) at 2. The Sixth Circuit fully affirmed the conviction in June of 2024. *See generally United States v. Stanton*, 103 F.4th 1204 (6th Cir. 2024), *cert. denied sub nom. Stanton v. United States*, 220 L.Ed.2d 385 (Jan. 13, 2025). Stanton, who went into custody post-verdict in August of 2022, has served about 32 months of the 10-year sentence.

Now an inmate at FCI Marion, Stanton filed this motion seeking compassionate release in February of 2025. *See* DE 403. 18 U.S.C. § 3582 governs his request. As amended by the First Step Act of 2018,[1] § 3582 requires an inmate seeking compassionate release either to "fully exhaust[] all administrative rights to appeal" through the BOP or to wait "30 days from the receipt of such a request by the warden" before filing a motion with the Court. 18 U.S.C. § 3582(c)(1)(A).

Before filing the present motion, Stanton first submitted his compassionate release request to the FCI Marion Warden on January 13, 2025. *See* DE 407-1. Stanton based the initial request on his wife's recent cancer diagnosis, the trouble she would experience with her care and maintaining the couple's 180-acre farm in Clarksville, Tennessee, and a purported lack of close family support aside from the couple's two sons, both employed full time and residing in Louisville, Kentucky. *See id.* at 2–3. The Warden denied the request on January 28, 2025. *See* DE 403-5. In justifying the denial, the Warden explained that Stanton had "not provided [sic] how [Stanton] was the only caregiver, as [Stanton] also [has] a son." *See id.* at 1.

Stanton, through counsel, then filed a motion for compassionate release on February 27, 2025. *See* DE 403. He echoes the themes in his initial request to the Warden, explaining that his

---

[1] Pub. L. No. 115-391, 132 Stat. 5194 (2018).

wife, Cathy Stanton, was recently diagnosed with Stage IV Small Cell Lung Cancer, requiring immediate and long-term chemotherapy and immunotherapy. *See* DE 403 at 6. The treatment, Stanton explains, necessitates frequent trips from Clarksville (her home) to Louisville (the treating hospital), which Mrs. Stanton finds difficult to complete on her own, and that associated side effects will make self-care, food preparation, medical management, and property maintenance, among other tasks, difficult for Mrs. Stanton. *See id.* at 9.  Additionally, in Stanton's view, his two sons, both based in Louisville, are not capable caregivers because of the distance between Clarksville and Louisville and the sons' occupational and familial obligations. *See id.* at 6. Although Stanton did not fully exhaust his administrative remedies through the appeals process, he cited the 30-day lapse provision as justifying the motion in this Court. *See* DE 403 at 3 (citing 18 U.S.C. § 3582(c)(1)(A)). The Government opposed the motion substantively, *see* DE 407, but agreed that the 30-day lapse satisfied the § 3582 prerequisites. *See id.* at 4–5.  Stanton then replied to the Government's substantive opposition. *See* DE 410.

Although the motion ripened only on April 4, Stanton now has filed a motion to expedite a ruling.  *See* DE 413.   Mrs. Stanton faces lung surgery in late May, and Stanton cites and relies on that surgery (a thoracotomy and pneumonectomy) as further validating the release request and heightening the need for a ruling.  The Court has considered that pending surgery as part of the overall record.

## II. Legal Standard

Generally, a "court may not modify a term of imprisonment once it has been imposed[,]" unless one of Congress's prescribed exceptions says otherwise. *See* 18 U.S.C. § 3582(c). Relevant here, a court may, on proper motion, "reduce [a] term of imprisonment . . . after considering the factors set forth in § 3553(a) to the extent they are applicable" if the Court finds that "extraordinary

3

and compelling circumstances warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" 18 U.S.C. § 3582(c)(1)(A) (relevant portions included).

The prevalence of § 3582(c) motions expanded greatly after Congress passed the First Step Act. Before the Act, § 3582(c) empowered only the BOP to move for compassionate release on an inmate's behalf. *See United States v. Jones*, 980 F.3d 1098, 1105–06 (6th Cir. 2020). It rarely utilized the power, though, either rejecting or ignoring the lion's share of compassionate release requests submitted by federal inmates. *See id.* at 1104 (between 2013–2017, the BOP approved only 6% of 5,400 compassionate release applications). The First Step Act altered this balance, allowing prisoners to directly seek compassionate release, or sentence reduction, from the courts after properly exhausting administrative remedies. *See* PL 115-391, 132 Stat. 5194; *see also Jones*, 980 F.3d at 1105. The direct portal appears at § 3582(c)(1)(a).

By separate statute, Congress in 1984 had directed the United States Sentencing Commission to define "extraordinary and compelling reasons for sentence reduction[.]" 28 U.S.C. § 994(t); *see id.* at (a)(2) (directing promulgation of "policy statements regarding . . . the appropriate use of . . . the sentence modification provisions set forth in . . . [§] 3582(c) of title 18"). The Sentencing Commission initially fulfilled Congress's directive in 2006, explaining that a court may reduce a term of imprisonment if (1) "[e]xtraordinary and compelling reasons warrant the reduction," (2) "[t]he defendant is no longer a danger to the safety of any other person or to the community," and (3) "[t]he reduction is consistent with this policy statement." U.S.S.G. § 1B1.13 (2006); *see also Jones*, 980 F.3d at 1105–06. Over the next twelve years, the Commission left that policy statement unchanged while building out a list of enumerated "extraordinary and compelling" circumstances that may warrant reduction or release. *Jones*, 980 F.3d at 1104. As it

4

stands today, following 2023 amendments, § 1B1.13 lists as potential "extraordinary and compelling" reasons a defendant's medical condition, age, family circumstances, status as a victim of abuse, unusually long sentence, and/or any other reason of similar gravity to the five enumerated circumstances. *See* § 1B1.13(b)(1)–(6).

Sixth Circuit guidance also helps light the way. *See United States v. Hunter*, 12 F.4th 555, 562–63 (6th Cir. 2021). *Hunter* held that "the text and structure of § 3582(c)(1)(A) limit a district court's discretion to define 'extraordinary and compelling' in two ways[.]" *Id.* at 562. First, non-retroactive changes in the law are not "extraordinary and compelling reasons" to grant a compassionate release motion. *Id.* "Second, facts that existed when the defendant was sentenced cannot later be construed as 'extraordinary and compelling' justifications for a sentence reduction." *Id.* Additionally, identifying "extraordinary and compelling circumstances," is by some measure, an act of common sense. *See United States v. McCall*, 56 F.4th 1048, 1055 (6th Cir. 2022) (en banc) (courts should look to the plain and ordinary meaning of "extraordinary" and "compelling" in resolving § 3582(c) motions). Compelling circumstances are generally those that are "most unusual, far from common, and having little or no precedent," *id.* (internal quotations omitted), while compelling circumstances are "forcing, impelling, and driving." *Id.* (citing *Webster's Third New International Dictionary* (1971)). The discretion extended is an exercise in judgment, not an act of whim. *See Hunter*, 12 F.4th at 562.

Like the pre-First Step Act version of § 3582, however, § 1B1.13's policy statements originally applied only to compassionate release motions made by the BOP on an inmate's behalf. *See* U.S.S.G. § 1B1.13 (2018). Thus, after the First Step Act empowered defendants to seek compassionate release directly from the courts, the Sixth Circuit—along with at least six other circuits—considered the policy statements inapplicable to § 3582 motions made by a defendant.

5

*See Jones*, 980 F.3d at 1109 ("Until the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion."). The Commission finally altered course through amendments in 2023, clarifying the qualifications and specifying that § 1B1.13's guidance applies equally to motions for compassionate release made by the BOP or an inmate. *See* U.S.S.G. § 1B1.13(a) (2023) ("Upon motion of the Director of Bureau of Prisons *or the defendant* . . . .") (emphasis added); *United States v. Remble*, No. 1:05-CR-113-1, 2024 WL 2962787, at *2 n.1 (S.D. Ohio June 12, 2024) ("[T]he Sentencing Commission amended U.S.S.G. § 1B1.13 effective November 1, 2023 to make clear that the policy statement applies to motions filed by inmates.").

With § 1B1.13's policy statements now amended and applicable in either setting, a § 3582(c) motion takes its full form.[2] In assessing a defendant's motion for compassionate release, the Sixth Circuit requires courts to follow a "three-step" inquiry, which assesses (1) whether "extraordinary and compelling reasons" warrant a sentence reduction, (2) whether release, if granted, would be "consistent with applicable policy statements issued by the sentencing commission," and (3) whether release is appropriate in light of the applicable § 3553(a) sentencing factors. *Jones*, 980 F.3d at 1101. Where courts were once instructed to ignore step two in defendant-initiated motions, *see United States v. Hampton*, 985 F.3d 530, 531 (6th Cir. 2021), § 1B1.13's latest iteration puts the issue back on the table.

---

[2] In addition to clarifying that § 1B1.13 applies equally to prisoner and BOP-initiated § 3582(c) motions, the Sentencing Commission's 2023 amendments also relocated the definitions section and the list of "extraordinary and compelling circumstances" from the notes into the substantive Guidelines provision. *Compare* U.S.S.G. § 1B1.13 (2018) *with* U.S.S.G. § 1B1.13 (2023). The move makes those provisions required reading for a reviewing court, rather than just useful explication.

6

The Court may deny a compassionate release motion "based on the defendant's failure to meet any one of [the] criteria." *United States v. Tomes*, 990 F.3d 500, 502 (6th Cir. 2021). Consequently, granting Stanton's request requires a positive finding at each step. *United States v. Navarro*, 986 F.3d 668, 670 (6th Cir. 2021) (noting that "where the district court grants a motion for compassionate release, it must of course address all three steps"). The defense has the burden on a reduction request. *See United States v. Gordon*, 2024 WL 1005772, at *2 (6th Cir. Mar. 4, 2024) (assigning burden to defendant); *United States v. Sherwood*, 986 F.3d 951, 954 (6th Cir. 2021) (defendant must make a "compelling case" as to why the sentencing court's § 3553 factorial analysis would be different if performed again today).

### III. Analysis

#### a. Extraordinary and Compelling Circumstances

Stanton relies primarily on § 1B1.13(b)(3)(B). He argues (1) that his wife's recent cancer diagnosis renders her incapacitated and in need of personal care, (2) that his two sons are not available caregivers given their distance and occupational and familial responsibilities, and (3) that as result, Stanton is the only available caregiver for Mrs. Stanton. *See* DE 403 at 9–10.

The Sentencing Guidelines provide, as one potential extraordinary and compelling circumstance, "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." *See* U.S.S.G. § 1B1.13(b)(3)(B). The guidelines do not define "incapacitation" or "only available caregiver." As to the former, courts have looked to other sources, finding that incapacitation means "a serious injury, or a debilitating physical illness and the result of the injury or illness is that the spouse . . . is completely disabled, meaning that the spouse . . . cannot carry on any self-care and is totally confined to a bed or chair." *United States v. Smith*, No. 21-cr-47, 2024 WL 3656187, at *5 (W.D.

Ky. Aug. 5, 2024); *United States v. Perry*, No. 7:19-cr-6-REW-EBA, DE 75 at 4 (E.D. Ky. Feb. 14, 2025) ("the BOP has defined 'incapacitation' as meaning that an individual 'cannot carry on any self-care' and 'is totally confined to a bed or chair' as a result of 'a serious injury[] or a debilitating physical illness'"); *see also United States v. Reedy*, No. 18-CR-00087-2, 2024 WL 5247954, at *11 (N.D. Ill. Dec. 30, 2024) ("While the relevant policy statement, § 1B1.13(b)(3)(B), does not define 'incapacitated,' the term's plain meaning—'made incapable of or unfit for normal functioning'—and the statutory context, especially the associated need for a 'caregiver,' make clear that 'incapacitated' implies that the person is incapable of caring for themself.") (citing *Incapacitated*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/incapacitated (last visited Nov. 26, 2024)).

Stanton's reliance on 1B1.13(b)(3)(B) is first misplaced because, at this juncture, Mrs. Stanton is not "incapacitated" as contemplated by courts interpreting and applying the provision. Stanton argues that Mrs. Stanton is "unable to care for herself given her diagnosis of Stage IV Small Cell Lung Cancer, and her inability to do so will only worsen as she continues to undergo Chemotherapy and Immunotherapy." DE 403 at 8. He further asserts that Mrs. Stanton is "unable to drive herself on the three-and-a-half-hour commute that is required for her Chemotherapy[,]" and that she will struggle to maintain the couple's 180-acre farm. *See id.* at 8–9.

The Court does not diminish the severe complications and difficulties that will almost certainly accompany Mrs. Stanton's treatment. However, in light of the high bar meant by "incapacitation," Mrs. Stanton is not, on this record, there. Stanton asserts that she will have trouble completing a 3.5-hour drive and that she may no longer be able to properly care for the couple's 180-acre farm and 18-acre homestead. But incapacitation is something quite different. As courts have noted, that level of limitation normally requires a showing that the spouse is "completely

8

disabled" and "confined to a bed or chair." *See United States v. Carter*, No. 19-20195, 2025 WL 28442, at *3 (E.D. Mich. Jan. 3, 2025) (defendant's wife not incapacitated where suffering from left-side paralysis after a stroke because nothing suggested that she "requires anything like intensive, around-the-clock care"); *United States v. Bond*, No. 19-CR-20018, 2025 WL 441761, at *2 (C.D. Ill. Feb. 10, 2025) (denying compassionate release motion based on defendant's wife's terminal cancer diagnosis because, despite the diagnosis, there was no evidence that defendant's wife could not carry on self-care or was totally confined to a bed or chair); *United States v. Garcia*, No. 10-CR-275-02-MJD, 2024 WL 3760286, at *2 (D. Minn. Aug. 12, 2024) (defendant's fiancée not incapacitated because "there [was] no evidence that she cannot care for herself"). Plainly, incapacitation takes meaning from the associated concept of a necessary caregiver.

Being unable to personally sustain a 3.5-hour drive and to properly maintain a large farm are certainly restrictions, but they're not incapacitation. Nothing in Stanton's motion or the tendered materials indicates that Mrs. Stanton is currently confined to a bed or chair, requiring continuous, around-the-clock care, even if she experiences some difficulty in daily tasks. *See, e.g.*, DE 403-2 at 17 (follow up visit from December 2024 indicating that "chief complaint" was coughing, wheezing, and shortness of breath); DE 403-3 at 1 (letter in support of motion from treating physician indicating the Mrs. Stanton experiences "severe fatigue, weakness, and difficulty managing routine tasks," but not that she is totally confined to a chair or bed or requires continuous, around the clock care). That is the degree of limitation 1B1.13(b)(3)(B) is concerned with, and nothing in the record suggests that Mrs. Stanton is currently experiencing such drastic limitations.[3]

---

[3] Stanton also emphasizes that Mrs. Stanton's mobility and capacity for self-care will worsen as treatment progresses. *See* DE 403 at 10; DE 410 at 2. That may well be the case. But a compassionate release motion is a determination of whether extraordinary and compelling circumstances justify release at a certain point

9

Further, the Stantons' two sons are available caregivers, even if that would mean disruption and inconvenience to them. Stanton argues that the two sons cannot provide sufficient care because they live 3.5 hours away from Mrs. Stanton's current residence in Clarksville, Tennessee and because they have full-time jobs and familial obligations. *See* DE 403 at 2; DE 403-4 at 1–4; DE 410 at 4–5. But these common complications, extant for most persons faced with an ailing family member, are not "extraordinary and compelling" circumstances. As courts frequently note when confronting similar arguments, distance between a needy relative and an alternative caregiver, especially when relocation of the family member is a legitimate possibility, is not itself an extraordinary or compelling circumstance. *See Steele*, 2024 WL 1928945, at *3 ("First, [defendant] says his brother lives in Georgia. That may well be the case. But Steele fails to explain why his mother could not move to Georgia, at least temporarily, if she needs in-home care. Or why his brother could not travel to Ohio, at least for some period of time, to provide that care.") (internal citations omitted); *United States v. Rhodes*, No. CRp-15-23, 2021 WL 4460031, at *6 (W.D. Pa. Sept. 29, 2021) ("[T]he record reflects that [defendant's] sister is available to provide care for his mother, although she does not live close by her mother."); *United States v. Hodges*, No. 5:22-CR-00033-1, 2024 WL 5250528, at *3 (S.D.W. Va. Dec. 30, 2024) ("Mr. Hodges notes the traveling distance for other caretakers [to his ailing brother]. But he is silent respecting (1) why [his brother] cannot move to his sister, daughter, or son, (2) why residential or in-home care is not an option . . . ."). Stanton similarly fails to explain why distance alone impedes Mrs. Stanton's care in an extraordinary or compelling way. Any number of potential remedies exist, in light of the tendered materials, including relocation to Louisville, extended trips for treatment, and/or some blend of

---

in time; it is not a remedy governed by future predictions of what might be. The Court focuses on the here and now, which establishes that although Mrs. Stanton is experiencing limitations, she is not incapacitated within the meaning of 1B1.13(b)(3)(B).

10

retained in-home care and hired transportation if Mrs. Stanton wishes to remain in Clarksville.

Further, the Court must remark on the treatment choices here. Mrs. Stanton has agency and is choosing treatment 3+ hours from her home. In one way, that is logical, given that her sons are in Louisville. It is not as logical, though, to the extent the release request hinges on distance from home to treatment. Mrs. Stanton could (as even Stanton's initial release request to the Warden noted) secure treatment as close as Nashville and even Clarksville itself. Thus, in a real sense, the election to treat in Louisville (certainly, Mrs. Stanton's prerogative) is creating part of the presented exigency, which thins the persuasiveness of the case. Further, the Court is unwilling to ignore the hired care and transportation options available to a family with the Stantons' means. Likewise, the Court is unmoved over the property upkeep woes attendant to a large farm and 18-acre homestead. Prison surely visits pain on the innocent, and § 3582(c) is not triggered by the burdens of asset management.

Stanton's sons relatedly submit that their frequent travel for work hinders any ability to provide Mrs. Stanton with necessary care. *See* DE 403-4 at 1–4. But occupational obligations for alternative caregivers—a near certainty when relying on adult children—similarly fall short of "extraordinary and compelling" circumstances. *See Bond*, 2025 WL 441761, at *2 ("Defendant admits that they have a son but claims that he is unavailable because of work. That is not enough to show that he is truly unavailable."). As other district courts have explained, "[t]hat these family members . . . must juggle the responsibilities of their lives along with taking care of the Defendant's wife is not sufficient." *United States v. Michel*, No. 23-CR-20349-RAR, 2025 WL 786284, at *4 (S.D. Fla. Mar. 12, 2025); *see also United States v. Gaidhane*, No. 20-20233, 2024 WL 5190203, at *2 (E.D. Mich. Dec. 20, 2024) (denying compassionate release to care for defendant's minor daughter although wife was required to work extensively on business days and noting that "[m]any

11

families face hardships when dealing with a family member who is incarcerated"). Indeed, loved ones are often adversely impacted by a family member's incarceration and must make necessary and inconvenient life adjustments while the person serves a prison term. These often unavoidable consequences, however, "do not create extraordinary circumstances that would satisfy the requirements of § 1B1.13(b)(3)." *Michel*, 2025 WL 786284, at *4 (quoting *United States v. Gonzalez*, No. 17-CR-60223, 2021 WL 4066897, at *5 (S.D. Fla. Sept. 7, 2021)). And while either one of Stanton's sons may not be able to shoulder the full caretaking burden, they do not explain why the pair could not "ease the burden" by each "assisting on at least a semi-regular basis." *United States v. Rivera*, No. 18-cr-00443-GC, 2023 WL 5627157, at *5 (D.N.J. Aug. 31, 2023) (finding that although one family member could not carry full burden of caretaking responsibilities of defendant's minor son, other family members had not explained why some combination of care could not sufficiently meet caretaking needs).[4]

Stanton submits that moving Mrs. Stanton closer to her two children to receive treatment and care is infeasible because it would "create more work" for Mrs. Stanton and would not "address the ongoing assistance that she requires independent of her long three-and-a-half hours commute to Louisville." DE 410 at 6. But relocating closer to family and otherwise adjusting one's life to account for a family member's incarceration are well within the routine and foreseeable, if inconvenient, adjustments family members of incarcerated persons must often make. *See Michel*, 2025 WL 786284, at *4; *United States v. Akram*, 568 F. Supp. 3d 295, 298 (W.D.N.Y. 2021) ("Unfortunately, families often suffer due to the criminal conduct and subsequent incarceration of one of their members, and Defendant's family is likely no exception to this harsh reality."); *United*

---

[4] Even excluding the prison variable, Americans regularly grapple with how to care for aging parents living elsewhere but with significant health needs. This dynamic is typical enough of care demands in America today.

12

*States v. Schnabel*, No. 2:17-CR-169, 2020 WL 3566613, at *4 (S.D. Ohio July 1, 2020) ("incarceration of many inmates poses a hardship to their families," but hardship alone is not "extraordinary").

Finally on § 1B1.13(b)(3)(B), Stanton argues that alternative third-party caregivers are not an option for Mrs. Stanton because she requires help with "routine tasks such as meal preparation, medication management, and maintenance of her property," because her care is "sporadic and impossible to predict," and because she needs "someone that she has a personal relationship with for emotional support." *See* DE 410 at 4–5. The first two categories fall within prior discussion, and Stanton does not demonstrate the lack of alternative caregiving or requisite incapacitation. Although the emotional support component surely would be unique to the spousal relationship, the Court is unwilling to elevate that indefinable quality across the § 1B1.13 threshold as a categorical proposition. The policy statement addresses caregiving, not the emotional freight of a specific and intimate relationship. And again, the deprivation of relationships is a difficult but universal component of incarceration.

The Court also considers the recent motion to expedite and updated materials. *See* DE 412. Mrs. Stanton has lung surgery scheduled for the latter half of May 2025. The materials reveal little particular about the surgery or its expected course, but a thoracotomy and pneumonectomy (interpreted here as a lung removal, *see* Cleveland Clinic, *What is a pneumonectomy?*, https://my.clevelandclinic.org/health/treatments/25003-pneumonectomy, (last reviewed May 5, 2023)) undoubtedly represents a significant medical event with a lengthy recovery. That certainly presents the likelihood of at least temporary incapacitation during the post-surgical phase. The Court accepts that, for some period of weeks after that May event, Mrs. Stanton will qualify as being incapacitated. However, the Court persists in its finding that Stanton has not shown himself

13

to be the "only available caregiver" in that period. The surgical note indicates that Mrs. Stanton is now living in Prospect, Kentucky, near to Louisville and her adult sons. *See* DE 413-1. The Court is not convinced that Mrs. Stanton cannot find suitable assistance during that incapacitation window through a combination of her sons (both in Louisville) and supplemental private care.

Stanton also incorporates a brief argument under § 1B1.13(b)(5), a release catchall, which allows a district court to grant compassionate release for unenumerated circumstances that "are similar in gravity to those described in paragraphs (1) through (4)." *See* U.S.S.G. § 1B1.13(b)(5). Stanton argues that the five-year survival rate for Stage IV Small Cell Lung Cancer is between 3–18%, creating an extraordinary and compelling circumstance to "spend what time is left with Cathy." *See* DE 403 at 9–10. Stanton supports the assertion with a single case, which he cites for the proposition that a court may grant supervised release for a family member's terminal cancer diagnosis. *See id.* (citing *United States v. Martinez*, No. 06-cr-591, 2020 WL 5517501, at *4–6 (S.D.N.Y. Sept. 13, 2020)). The case is easily distinguishable. The court in *Martinez* primarily granted the defendant's motion because he was scheduled for release in just over a month after the decision, which COVID-19 complications threatened to delay. *See id.* at *1. Stanton, still over five years away from his scheduled release and well past the difficulties of the pandemic, is not in similar shoes. And while there was some suggestion that the defendant's release went "beyond the physical" and into emotional support for his ailing sister, *see id.* at 2, the calculus was quite different given the extremely short duration of the remaining sentence. The pre-amendment decision also did not turn on § 1B1.13(b)(5); the court decided the matter without citing a specific provision of § 1B1.13 at all. *Martinez* does little for Stanton, and he offers no other authority to support his truncated § 1B1.13(b)(5) argument.

Is the prospect of losing a spouse during incarceration weighty and impactful?[5] Obviously so. However, to repeat, crime has fearsome costs. Stanton engaged in a distribution conspiracy over five years, and the Court imposed a warranted sentence. Every BOP inmate faces segregation from the lives and often from the deaths of family and loved ones. That truth is an aspect of long-term incarceration. The Court took no pleasure in subjecting Stanton to prison. It takes no pleasure in demanding that Stanton continue to serve as his wife faces cancer. But the difficult human dynamics here result not from system harshness or lack of empathy. Stanton authored his culpable course, and that set of choices, along with human mortality, yields the situation now burdening the Stanton family. The same scenario unfolds time and again for families involved with BOP custody, and the Court rejects (b)(5) as here providing a justification for release.

In sum, Stanton fails to present extraordinary and compelling circumstances, within the meaning of § 1B1.13, to justify his request.

   **b.  § 3553(a) Factors**

Even if Stanton passed the "extraordinary and compelling" gate, the § 3553 rubric would foreclose release, in the Court's studied view and discretion.

Stanton and his codefendant physician used Gateway Medical Associates—a medical clinic in Clarksville, Tennessee—to prescribe a sea of, *e.g.*, oxycodone, oxymorphone, and Xanax "outside the scope of their profession and not for legitimate medical purposes." *See* DE 334 (PIR) at ¶¶ 8–30. Stanton, the Medical Director no less, "repeatedly failed to adhere to accepted professionally standards for prescribing controlled substances" by failing to create a proper patient history before prescribing the drugs, conducting cursory and high-volume office visits with no

---

[5] The tendered materials give only generic predictions across Stage IV cancer. Stanton has not demonstrated through record documents the likely particular course for Mrs. Stanton. All respect to Dr. Lye, who is an advocate for his patient, but his vantage point is but one part of the picture the Court must properly sort under the rigorous § 3582 standard.

physical examination or other meaningful medical decisionmaking, prescribing the drugs in dangerous quantities and combinations, and offering drugs to patients that exhibited obvious signs of diversion and abuse. *See id.* at ¶¶ 9–10. The conviction led to a staggering Converted Drug Weight range of between 10,000 to 30,000 (actually, over 21,000, mostly OC and oxymorphone) kilograms at sentencing. *See id.* at ¶ 31. The Court, considering this record, designed Stanton's sentence to, among other things, reflect the gravity of the crime, promote respect for law, provide just punishment, and to serve as a "cautionary tale" for medical professionals contemplating illicit prescription practices. *See* DE 343 (Statement of Reasons) at 5. The Court recited its full basis in the SOR, which remains completely applicable. The Sixth Circuit wholly affirmed the conviction and sentence, noting Stanton's red flag awareness, facilitation as Medical Director, authorship of 40% of clinic prescriptions from 2018–20, and misleading post-raid personal conduct. *See Stanton*, 103 F.4th at 1210–11.

The Court acknowledges that Stanton has put in 32 months, and that stretch has not featured discipline or other problems. That is laudable but also expected. The Court did not see Stanton as a persisting danger, and his has not been a life of crime. The full history yielded a sentence far below what the range advised. The Court stands by the calculus, which landed on a stout but parsimonious result.

Early release here would enervate the Court's construct and thwart critical § 3553 goals. Release at 27% of the term would understate crime gravity, discount respect for law, dilute required punishment, and weaken the much needed generally deterrent effects. Further, release would disserve sentencing fairness and predictability across a system that strives for equal justice under law.

The Court finds it remarkable and telling that Stanton describes himself, relative to the

conviction, as "not distributing illicit substances with a blatant disregard for the federal drug laws." DE 403 at 11. Stanton continues to see himself as criminally blameless, merely a loser in a credibility contest between him and Dr. King—"In Dr. King's view, Dr. Stanton could have done more." *See id.* Stanton stands convicted of knowingly conspiring to distribute controlled substances illegally over a multi-year operation. This required the imprimatur of Stanton as medical director at a clinic beset with red flags and serving a vagabond patient population mostly driving long distances to get their prized scripts. Stanton's continued resistance to the reality of the crime, a vestige of the "post-raid dissembling and self-serving correspondence" mentioned in the SOR, strongly communicates that the sentence has much work left to do regarding punishment and respect for law.

Importantly, the Court also originally accounted for the nuances in Stanton's circumstances, including that he was a first-time offender, that he received a comparatively modest financial gain (relative to his codefendant, Dr. Maccarone), and that Stanton, given his age and licensure loss, presented a low risk to society and would likely be responsive to punishment. *See* DE 343 at 5. These considerations produced a significant variance in Stanton's favor, down 68 months from the bottom end of the applicable guideline range. As originally figured, Stanton still deserves a "hefty term" for his crime, even if mitigating factors originally called for a sentence below the guidelines range. Three years—the approximate time Stanton has now served when accounting for credit—would have been far too short a term then, and it's far too short a term now.

In the Court's discretion and firm belief, the § 3553(a) calculus, unchanged since sentencing, forecloses a reduction in sentence for Stanton.

**IV.    Conclusion**

For the stated reasons, the Court **DENIES** DE 403, Stanton's request for release or reduction. The Court also **DENIES** DE 413, the motion to expedite, as mooted by the Court's timely ruling on the foundational motion.

This the 23rd day of April, 2025.

Signed By:
*Robert E. Wier*
United States District Judge