UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>JOHN L. STANTON, )<br>)<br>)<br>Defendant. ) | No. 6:21-cr-00019-REW-HAI-4<br><br>OPINION & ORDER |

\*\*\* \*\*\* \*\*\* \*\*\*

The Court denied Defendant John Stanton compassionate release. *See* DE 415. It held that Stanton failed to demonstrate that his wife, recently diagnosed with lung cancer, was incapacitated and that he is her only available caregiver. *See id.* The Court also rejected the request under applicable § 3553 factors. Stanton asks the Court to revisit that holding by way of a reconsideration motion. *See* DE 417. The Government remains opposed to Stanton's release. *See* DE 422. The Court has thoroughly reviewed its previous opinion, Stanton's motion to reconsider, and the additional records submitted alongside the motion. The additions and argument, to the extent new, do not change the result. Stanton still fails to substantiate his wife's incapacitation or show that he is the *only* available caregiver. The Court persists in the view that release would not be appropriate under the values of § 3553. The Court, for a host of reasons, **DENIES** the motion.

I.   **Background**

The Court incorporates its prior background section, largely still applicable. *See* DE 415 at 2–3. It adds what additional background Stanton offers, as relevant, through his reconsideration motion. Mrs. Stanton suffers from lung cancer. As part of her treatment, she underwent a right

lung resection on May 19 of this year to attempt to extract cancerous portions and prevent further growth. *See* DE 417 at 3. That operation, like all her treatment, took place in Louisville, about a three-and-a-half-hour drive from her home in Clarksville Tennessee, but close to her two sons who also live in or around Louisville. *See id.* at 3–4. Stanton provides medical records showing that the surgery occurred, but the Court's untrained medical eye prevents any further conclusions about the surgery's relative success. *See* DE 417-4 at 2–3. Stanton does not guide the Court on that front. *See id.*; *see also* DE 420 at 2–3, 5–10.

## II.    Legal Standard

The Federal Rules do not expressly provide for "Motions to Reconsider." *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 Fed. App'x. 949, 959 (6th Cir. 2004) (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991)). Nevertheless, "[d]istrict courts have authority both under common law and [Federal Rule of Civil Procedure] 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Id.*

Courts also borrow from Civil Rule 59(e)—the standard Stanton invokes—when assessing criminal reconsideration. *See, e.g.*, *United States v. Lewis*, No. 2:20-CR-0003-2, 2020 WL 2557196, at *1 (S.D. Ohio May 20, 2020) ("The Sixth Circuit has applied the Federal Rule of Civil Procedure 59(e) standard for motions to alter or amend to motions for reconsideration in criminal cases.") (citing *United States v. Correa-Gomez*, 328 F.3d 297, 298 (6th Cir. 2003)). Criminal reconsideration, to the extent it exists, carries with it unique timeliness requirements linked to the normal appeal timeline for criminal cases. The Sixth Circuit requires a criminal defendant to file a reconsideration motion "within the period provided by Fed. R. App. P. 4(b)(1) unless the local rules of the district court provide otherwise." *Correa-Gomez*, 328 F.3d at 299. "Effectively, this means that criminal defendants must file such motions within [fourteen] days of the judgment

2

entry, Fed. R. App. P. 4(b)(1)(A)(i), and the government must file such motions within thirty days. Fed. R. App. P. 4(b)(1)(B)(i)." *Id.* That limitation prevents a criminal defendant from creating an end run around appeal timeliness by filing an appealable reconsideration motion after the appeals deadline lapsed on the underlying motion.

Stanton filed this reconsideration motion 30 days after the Court's resolution of the underlying motion—well in excess of the applicable fourteen-day deadline. *See* DE 417 (filed May 23, 2025). The motion is thus procedurally improper, which provides a liminal basis for denying relief.

Moreover, Stanton has not provided exhaustion proof concerning this second motion—a requirement for renewing his requested relief. *See United States v. Alam*, 960 F.3d 831, 833–35 (6th Cir. 2020) (holding exhaustion to be mandatory); *United States v. Gordon*, No. 92-81127, 2022 WL 452450, at *2 (E.D. Mich. Feb. 14, 2022) ("That the Court previously denied a similar motion for compassionate release does not excuse the defendant complying with the exhaustion requirement before renewing his motion."). This too prevents a defendant seeking compassionate release from evading standard procedural markers through a reconsideration vehicle. Although this too might block the request, the Government does not raise the issue in its response.

However, as to the merits, the Court also denies. Motions for reconsideration serve a limited function. Generally, a motion for reconsideration is only warranted when there is: (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice. *See Louisville/Jefferson Cnty. Metro. Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (alteration omitted). Motions for reconsideration are not intended to re-litigate issues previously considered by the Court or to present evidence that could

3

have been raised earlier. *See United States ex rel. O'Laughlin v. Radiation Therapy Servs., P.S.C.*, No. CV 16-cv-148-DLB-EBA, 2021 WL 3863343, at *2 (E.D. Ky. Aug. 30, 2021).

The compassionate release standard remains the same. Generally, a "court may not modify a term of imprisonment once it has been imposed[,]" unless one of Congress's prescribed exceptions says otherwise. *See* 18 U.S.C. § 3582(c). A court may, on proper and exhausted motion, "reduce [a] term of imprisonment . . . after considering the factors set forth in § 3553(a) to the extent they are applicable" if the Court finds that "extraordinary and compelling circumstances warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]" 18 U.S.C. § 3582(c)(1)(A) (relevant portions included).

As it stands today, following 2023 amendments, § 1B1.13 lists as potential "extraordinary and compelling" reasons a defendant's medical condition, age, family circumstances, status as a victim of abuse, unusually long sentence, and/or any other reason of similar gravity to the five enumerated circumstances. *See* § 1B1.13(b)(1)–(6). In assessing a defendant's motion for compassionate release, the Sixth Circuit requires courts to follow a "three-step" inquiry, which assesses (1) whether "extraordinary and compelling reasons" warrant a sentence reduction, (2) whether release, if granted, would be "consistent with applicable policy statements issued by the sentencing commission," and (3) whether release is appropriate in light of the applicable § 3553(a) sentencing factors. *United States v. Jones*, 980 F.3d 1098, 1101 (6th Cir. 2020). The Court may deny a compassionate release motion "based on the defendant's failure to meet any one of [the] criteria." *United States v. Tomes*, 990 F.3d 500, 502 (6th Cir. 2021). Consequently, granting Stanton's request requires a positive finding at each step. *United States v. Navarro*, 986 F.3d 668, 670 (6th Cir. 2021) (noting that "where the district court grants a motion for compassionate release,

4

it must of course address all three steps"). Stanton has the burden to justify the requested relief. *See United States v. Gordon*, 2024 WL 1005772, at *2 (6th Cir. Mar. 4, 2024) (assigning burden to defendant).

### III. Analysis

#### a. Extraordinary and Compelling Circumstances

Stanton cites similar challenges raised in his initial request. He worries that Mrs. Stanton "will be required to drive herself to Louisville for the surgery, approximately three-and-a-half (3.5) hours each way, due to the lack of available family support." *See* DE 417 at 2–3. He also explains that although Mrs. Stanton can stay with her sons for some amount of time, her low white blood cell count renders her susceptible to infection and thus incapable of staying with her sons indefinitely. *See id.* Stanton also raises his sons' occupational and familial obligations, surmising that they render them "unavailable" as caregivers to Mrs. Stanton. *See id.*

None of these concerns alter the fundamental analysis the Court previously conducted. To justify release under § 1B1.13(b)(3)(B), Stanton must show *both* that Mrs. Stanton is incapacitated and that he is her *only* available caregiver. He fails, still the same, on both fronts.

Beginning first with incapacitation, nothing in the record shows that Mrs. Stanton's limitations place her in this narrowly defined category. As the Court previously explained, "incapacitated" carries a distinct legal meaning. A spouse is only incapacitated under § 1B1.13(b)(3)(B) where "the spouse . . . is completely disabled, meaning that the spouse . . . cannot carry on any self-care and is totally confined to a bed or chair." *United States v. Smith*, No. 21-cr-47, 2024 WL 3656187, at *5 (W.D. Ky. Aug. 5, 2024); *United States v. Perry*, No. 7:19-cr-6-REW-EBA, DE 75 at 4 (E.D. Ky. Feb. 14, 2025) (same).

Just like before, nothing Stanton submits shows that Mrs. Stanton falls into that category.

5

The surgery didn't seem to change that. Stanton explains that, as part of Mrs. Stanton's post-procedure care, she would first go to an intensive care unit for immediate recovery, then to her son's home for further recovery until she is able to drive herself to Clarksville. *See* DE 417 at 3. Having the stamina and capacity to successfully complete a three-and-a-half-hour drive is inconsistent with "being totally confined to a bed or chair." *Smith*, 2024 WL 3656187, at *5.

What the Court can glean from the voluminous—many irrelevant—medical records Stanton submits support this view. Her discharge summary four days after the operation reported normal functioning, and called for discharge to home with outpatient follow up. *See* 417-4 at 5. Further, the post-operative reports indicate no complications and show that Mrs. Stanton emerged from surgery in stable condition with full ambulatory control and normal breathing in the hours after the surgery. *See* DE 417-3 at 27 (noting no oxygen requirements for Mrs. Stanton and prescribing "[r]outine postop care"); *see also* DE 417-4 at 2–3 (reporting that Mrs. Stanton faced "no intraoperative complications" and that she "was in stable cardiopulmonary condition"); *id.* at 9–10 (reporting that Mrs. Stanton was "resting comfortably in no distress," had "full range of motion" in her extremities, and had "[n]ormal work of breathing"). The surgery surely limited Mrs. Stanton in some ways. A pneumonectomy is no small affair. But again, the standard is not whether Mrs. Stanton faces limitations—it's whether she is incapacitated. The record does not support that assertion.

Even assuming incapacitation, Stanton still fails to show that he is the *only* available caregiver for Mrs. Stanton. He mainly argues, like he did before, that his sons' two homes in and around Louisville are not feasible long term because of familial and occupational obligations and because Mrs. Stanton's low white blood cell count prevents her from staying around her young grandchildren for long periods. *See* DE 417 at 3–4.

6

First, as the Court previously explained, routine familial and occupational impediments do not render potential caregivers unavailable. *See United States v. Bond*, No. 19-CR-20018, 2025 WL 441761 (C.D. Ill. Feb. 10, 2025) ("Defendant admits that they have a son but claims that he is unavailable because of work. That is not enough to show that he is truly unavailable."); *United States v. Michel*, No. 23-CR-20349-RAR, 2025 WL 786284, at *4 (S.D. Fla. Mar. 12, 2025) ("That these family members and friends must juggle the responsibilities of their lives along with taking care of the Defendant's wife is not sufficient."); *United States v. Gaidhane*, No. 20-20233, 2024 WL 5190203, at *2 (E.D. Mich. Dec. 20, 2024) (denying compassionate release to care for defendant's minor daughter although wife was required to work extensively on business days and noting that "[m]any families face hardships when dealing with a family member who is incarcerated"); *United States v. Rivera*, No. 18-cr-00443-GC, 2023 WL 5627157, at *5 (D.N.J. Aug. 31, 2023) (finding that although one family member could not carry full burden of caretaking responsibilities of defendant's minor son, other family members had not explained why some combination of care could not sufficiently meet caretaking needs).

Stanton doesn't meaningfully deal with these cases. Indeed, he entirely ignores them in his reconsideration motion, submitting only—without support—that work and family make caring for Mrs. Stanton more than a "mere 'inconvenience'" to the Stantons' sons. *See* DE 417 at 4. The Court must gauge unavailability of alternative caregivers, and the cases thoroughly support the notion that these types of impediments are not extraordinary and compelling. Stanton offers nothing to the contrary in this renewed motion.

The Court also previously referenced alternative possibilities for Mrs. Stanton to receive care, including moving closer, but not necessarily with, her sons and the possibility of third-party care. *See* DE 415 at 12–14. The Court found that Stanton failed to foreclose why those avenues

7

did not offer viable means of care for Mrs. Stanton. *See id.* at 11.

His effort is no better here. Really, Stanton doesn't even address the issue. He states only that Mrs. Stanton "lost confidence" in her care team in Clarksville, where she currently resides. *See* DE 417 at 2. That may be the case. The treatment move was Mrs. Stanton's choice, though (even if a subjectively justifiable one), and the corresponding inconveniences associated with a spouse's choice to obtain care in a different city from her residence do not factor into the § 1B1.13 analysis. Just as importantly on this front, Stanton's complete failure to address third-party caregivers leaves open a viable alternative that the well-resourced Stanton never addressed. Nothing in § 1B1.13(b)(3)(B) limits alternative caregivers to family members, and the Court, still, is "unwilling to ignore the hired care and transportation options available to a family with the Stantons' means." DE 415 at 11.

Stanton's reconsideration leaves the matter just where it ended. He fails to substantiate Mrs. Stanton's incapacitation, his sons' unavailability to provide Mrs. Stanton care, and any appreciable reason why some combination of third-party private care couldn't help fill the gaps. Stanton does not medically substantiate the exposure risks mentioned as a reason to exclude the sons' homes. Nothing in the motion tempts, much less compels, the Court to disturb its prior ruling.

### b. Purported Failure to Consider the Second Chance Act and Time Served

Stanton submits that the Court failed to consider the Second Chance Act and his time served in the first go around. *See* DE 417 at 4. First, that's because the Second Chance Act has nothing to do with compassionate release; it provides no mechanism for criminal defendants to reduce their terms of imprisonment through a petition to the Court. Regardless, the Court clearly did consider Stanton's time already served. It noted, as a § 3553(a) matter, that Stanton's release

8

after serving just a quarter of his sentence would "understate crime gravity, discount respect for law, dilute required punishment, and weaken the much needed generally deterrent effects. Further, release would disserve sentencing fairness and predictability across a system that strives for equal justice under law." *See* DE 415 at 16. Stanton conveniently skips over that thread. Rather, Stanton claims that he's now served "more than fifty percent of his sentence" because his Second Chance Act "Conditional Transition to the Community Date" is currently estimated to come around in August 2027. *See* DE 417-2. That's not the measure of Stanton's sentence, to be clear—that's the earliest possible date he might transition to the community based on a combination of Second Chance Act and First Step Act credits, as determined by BOP. *See* Federal Bureau of Prisons, *Updates on Time Credits and Community Placement*, https://www.bop.gov/news/20241004-fbop-updates-to-phone-call-policies-and-time-credit-system.jsp (Oct. 4, 2024). Credits are entirely a BOP function, and the Court has no control over that aspect of the sentence. Stanton's projected release date based on his sentence is still March of 2031, *see* DE 417-2, which is the date the Court used in referenced Stanton's completion of just over a quarter of his sentence. The Court perceives no deficiency in that analysis.

      c. § 3553 values

Finally, again, and to be clear, § 3553 values would, in the Court's assessment and discretion, foreclose a reduction in sentence. Stanton, now litigating through the self-centered lens of his wife's health challenges, advocates for "an individualized application of justice" leading to his release. *See* DE 417 at 5. The Court must use a perspective that accounts for all concerns in this case, as it did in formulating the sentence originally.

The prior statement of reasons maintains currency and has controlling logic. Stanton's broad and damaging crime assured a river of opioids flowing into the E.D. Ky. Without sufficient

9

concern for prescription propriety, Stanton used his trusted place as a physician to intentionally propagate the operations of an injurious, felonious pill mill. The Court sentenced a remorseless Stanton in a way purposefully designed to show the gravity of the crime, to promote respect for law, to justly punish Stanton, and to deter both him and the broader community from like criminal choices. Again, with all compassion toward Mrs. Stanton and empathy for her plight, the Court simply is not willing to recalibrate the sentencing approach and except Stanton—in the end, a drug trafficker in a nation[1] scourged by drugs—from the accountability and consequences wrought by the judgment in this case.

### IV. Conclusion

For each of the reasons stated, the Court **DENIES** DE 417.

This the 21st day of July, 2025.

Signed By:
Robert E. Wier
United States District Judge

---

[1] This again calls to mind the importance of avoiding unwarranted sentencing disparities. A reduction here would enter such disfavored territory.